SECCOMB v. WURSTER, Mayor, et al.

(Circuit Court, E. D. New York. December 22, 1897.)

1. STREET RAILROADS— GRANTING OF FRANCHISE — INJUNCTION — RIGHTS OF ABUTTING OWNER.

The mere granting of consent by the local authorities to the building and operation of a street railroad does not constitute irreparable injury to abutting property, so as to entitle an owner to maintain a suit to enjoin such action.

2. JURISDICTION OF FEDERAL COURTS—TAXPAYER'S SUIT.

Under the New York statutes authorizing suits by taxpayers (Laws 1881, c. 531; Laws 1887, c. 673; Laws 1892, c. 301), although the entire body of taxpayers in a city, the city itself, and the general public may be interested in the result, a complainant cannot be compelled to admit others as co-complainants; and a federal court has jurisdiction of such a suit where the requisite diversity of citizenship exists between the parties to the record.

3. TAXPAYERS' SUITS—RIGHT TO PRELIMINARY INJUNCTION.

In a taxpayer's suit under the statutes of New York to restrain an alleged illegal official act, which, if illegal, could not confer any rights nor work irreparable injury to complainant, to entitle the complainant to a preliminary injunction the right to such relief must be made clear and certain.

4. FEDERAL COURTS—CONSTRUCTION OF STATUTE—DECISION OF STATE COURT.

A decision of an appellate court of the state construing a state statute will be followed by a federal court in determining a motion for a prelim-

inary injunction in a taxpayer's suit, though the question has not been settled by the state court of last resort.

5. STREET RAILROADS—GRANTING OF STREET FRANCHISE—CHARTER OF GREATER NEW YORK.

That section 74 of the Greater New York charter (Laws 1897, c. 378), which prescribes the procedure in granting franchises in the streets of the city, took effect upon its passage, instead of coming into force with a majority of the charter provisions, on January 1, 1898, is not so clear as to warrant a federal court, in the absence of a construction by the state courts, in restraining by a preliminary injunction the action of the municipal authorities in granting a franchise to a street railroad in accordance with the provisions of previously existing statutes, where such injunction would have the effect to prevent any action by such authorities during the remainder of their official existence.

6. SAME—CONSENT TO USE STREETS—PROCEDURE OF CITY COUNCIL.

Under section 92 of the New York Railroad Law, which requires public notice to be given of the time and place of the first consideration by a committee of the common council of an application for consent to use streets for railroad purposes, the fact that after such notice has been given and hearings had, and while the matter is still in the hands of the committee, its membership is changed in part, the council remaining the same, does not necessitate a new notice, nor render the action of the council after the committee has made its report invalid.

7. SAME—INJUNCTION AGAINST GRANTING FRANCHISE—LEGALITY OF INCORPORATION.

That a street-railroad company is without the certificate of the board of railroad commissioners required by section 59 of the railroad law, showing that it has published its articles of incorporation as therein required, and that public convenience and necessity require the construction of such railroad, does not, under the conflicting decisions of the state courts, so clearly incapacitate such company to receive a franchise to use the streets of a city as to justify a court in restraining the city authorities from granting such franchise by a preliminary injunction in a taxpayer's suit.

This was a bill by Mary T. Seccomb against Frederick W. Wurster, as mayor of the city of Brooklyn, David S. Stewart and 27 others, constituting the board of aldermen, and the East River & Atlantic Ocean Railroad Company, to enjoin the granting of a franchise to the defendant railroad company in certain streets in Brooklyn.

This is a motion for an injunction pendente lite, as prayed in the bill. The suit was originally begun against the mayor and the board of aldermen only, and relief prayed for against them. Subsequently, and before the argument of this motion, the railroad company, upon its own application, and with the consent of the solicitors for the complainant, was joined as a party defendant. All the defendants are citizens of the state of New York, and residents of the Eastern district. The complainant is a citizen of the state of Connecticut, resident of Washington, in said state. The suit is brought to prevent the defendants, members of the board of aldermen, from voting to pass a certain resolution adopted by said board of November 29, 1897, over the veto of the mayor, and also to prevent said defendants, members of the board of aldermen, from "passing or adopting any resolution whatever granting or purporting to grant to the East River & Atlantic Ocean Railroad Company, aforesaid, any franchises or rights whatsoever, except in conformity to and in compliance with sections 73 and 74 of chapter 378 of the Laws of 1897 of the State of New York, known as the 'Greater New York Charter,' and section 92 of the railroad law of the state of New York." The complainant avers that she is the owner of real estate situated on Hicks street, in the city of Brooklyn, which is assessed in the amount of $25,000, upon which she is liable to pay, and has paid, the tax annually imposed; that the East River & Atlantic Ocean Railroad Company was organized on or about November 15, 1895, and made application, on or about February 3, 1896, to the board of aldermen, for con-

sent and permission to construct, maintain, and operate a street-surface rail-
way through certain streets and avenues. which are set forth in detail in the
complaint; that on February 3, 1896, this application was referred by the
board of aldermen to its committee on railroads, which committee gave pub-
lic hearing upon said application, on certain days in 1896, specifically set forth.
It is further averred that on or about January 4, 1897, the said board elected
a new president from its body, who, on or about January 12, 1897, appointed
new standing committees, among others, a committee on railroads; appar-
ently this committee consists of seven members, and five of those composing
the present committee were also members of the committee of 1896; that the
committee on railroads, as constituted during the year 1897, presented a
report, on or about November 29, 1897, recommending the granting of the
application of the defendant railroad company; that thereupon a resolution em-
bodying said report and granting said application was adopted by the said
board; that no public hearings, either before the board or the committee, were
had, other than those above referred to, which were had in the year 1896.
The complaint charges that the said resolution of the board is illegal and
void, for the reason that said petition was not considered after due public
notice, as required by paragraph 92 of the railroad law of the state of New
York. It further charges that the action of the board in passing such reso-
lution was illegal, null, and void, because in contravention of section 59 of
chapter 565 of the Laws of 1892, which provides that no railroad corporation
thereafter formed shall exercise the powers conferred by law on such corpo-
ration until the directors shall cause a copy of its articles of association to be
published, and until the board of railroad commissioners shall certify that
such publication has been made, etc.

Various other specifications of illegality are set forth in the complaint, a
brief statement of which will be found in the following opinion. The most
important of these, and the one to which argument has been more particularly
addressed, is the averment that the said resolution is illegal, null, and void,
because it is in contravention of paragraphs 73 and 74 of the Greater New York
Charter (Laws 1897, c. 378). These sections are as follows:

"Sec. 73. After the approval of this act no franchise or right to use the
streets, avenues, parkways or highways of the city shall be granted by the
municipal assembly to any person or corporation for a longer period than
twenty-five years, but such grant may at the option of the city provide for
giving to the grantee the right on a fair revaluation or revaluations to renew-
als not exceeding in the aggregate twenty-five years. Such grant, and any
contract in pursuance thereof, may provide that upon the termination of the
franchise or right granted by the municipal assembly the plant, as well as
the property of the grantee in the streets, avenues, parkways and highways
with its appurtenances, shall thereupon be and become the property of the
city without further or other compensation to the grantee; or such grant and
contract may provide that upon such termination there shall be a fair valu-
ation of the plant and property which shall be and become the property of
the city on the termination of the grant on paying the grantee such valua-
tion. If by virtue of the grant or contract the plant and property are to
become the city's, without money payment therefor, the city shall have the
option either to take and operate the said property on its own account, or to
renew the said grant for not exceeding twenty years upon a fair revaluation,
or to lease the same to others for a term not exceeding twenty years. If the
original grant shall provide that the city shall make payment for the plant
and property, such payment shall be at a fair valuation of the same as prop-
erty excluding any value derived from the franchise; and if the city shall
make payment for such plant and property it shall in that event operate the
plant and property on its own account for at least five years, after which it
may determine either to continue such operation on its own account, or to
lease the said plant and property and the right to use the streets and public
places in connection therewith for limited periods, in the same or similar man-
ner as it leases its ferries and docks. Every grant shall make adequate pro-
vision, by way of forfeiture of the grant or otherwise, to secure efficiency of
public service at reasonable rates, and the maintenance of the property in
good condition throughout the full term of the grant. The grant or contract

shall also specify the mode of determining the valuations and revaluations therein provided for.

"Sec. 74. Before any grant of the franchise or right to use any street, avenue, parkway or highway shall be made, the proposed specific grant embodied in the form of an ordinance with all of the terms and conditions, including the provisions as to rates, fares and charges, shall be published at least twenty days in the City Record and at least twice in two daily newspapers published in the city to be designated by the mayor at the expense of the proposed grantee. Such ordinance shall on its introduction and first reading be referred by the municipal assembly to the board of estimate and apportionment, who shall make inquiry as to the money value of the franchise or privilege proposed to be granted and the adequacy of the compensation proposed to be paid therefor, and no grant thereof by the municipal assembly shall be made except on terms approved by vote or resolution of the board of estimate and apportionment, entered on the minutes or record of such board, and every ordinance containing or making such grant shall require the concurrence of three-fourths of all the members elected to each branch of the municipal assembly as shown by the ayes and noes there recorded and the approval of the mayor, and thirty days at least shall intervene between the introduction and final passage of any such ordinance. It shall require a vote of five-sixths of all the members elected to each branch of the municipal assembly to pass such ordinance over the mayor's veto. This act shall apply to any renewal or extension of the grant or leasing of the property to the same grantee or others."

The complaint further avers that there is sufficient ground to believe that, unless restrained by injunction, the board of aldermen will pass the resolution over the veto of the mayor; and that, in the event of their being restrained by injunction from such action, there is good reason to believe that they will adopt a new resolution, granting to the said railroad company the consent of the local authorities to the construction and operation of their road for the period of 25 years. The application for preliminary injunction is supported by affidavits.

Cameron & Hill and Fred. K. R. Coudert, for complainant.

Joseph A. Burr, Corp. Counsel, for mayor, etc., of city of Brooklyn.

Luke D. Stapleton, for certain defendants.

James C. Church, for defendant East River & A. O. R. Co.

LACOMBE, Circuit Judge (after stating the facts). There was some discussion upon the oral argument as to whether complainant brought this suit as a taxpayer, under the express statutory provisions authorizing such suit (Laws 1881, c. 531; Laws 1887, c. 673; Laws 1892, c. 301), or as an individual abutting owner, to prevent some anticipated injury to her individual property. The complaint is evidently framed as a taxpayer's bill under the statute. It contains the averments as to payment of taxes which said statute calls for; and it is thought that upon the oral argument it was conceded by complainant that this is a taxpayer's suit, under these statutes. It will be treated as such in this opinion, for under any other theory the relief asked for by way of preliminary injunction would be premature. There is nothing to show that the granting of a consent to build and operate a street railroad by the local authorities contrary to the provisions of law will work irreparable injury to the abutting owner. When the railroad company, relying upon such consent, may undertake to build its road, such abutting owner may apply for relief; but that time may never come, and, until some danger peculiar to the abutting property is threatened, the owner of such property is in no position to demand a preliminary injunction peculiarly for its protection.

It is contended in opposition to the motion that, if complainant is suing under the taxpayer's act, the suit is one in which the parties in interest on the complainant's side are in reality the city of Brooklyn and the general body of taxpayers therein, and that the federal court would have no jurisdiction of such an action. The statute gives to any person whose assessment shall amount to $1,000, and who shall be liable to pay taxes on such assessment, and shall have paid them within one year, an independent right to sue and to prosecute the suit thus brought, without being compelled to allow other parties in interest to come in and join themselves as co-complainants. It is true that the city of Brooklyn, other taxpayers therein, and, indeed, the public generally, are interested in the result, possibly more interested than this complainant; but, so long as she chooses to prosecute this suit as sole complainant, none of those thus interested can become parties to the record on the complainant's side of the controversy. This is determinative of the objection. "In controversies between citizens of different states, the jurisdiction of the federal courts depends, not upon the relative situation of the parties concerned in interest, but upon the relative situation of the parties named in the record. * * * If [parties plaintiff] are personally qualified by their citizenship to bring suit in the federal courts, the jurisdiction is not defeated by the fact that the parties whom they represent may be disqualified." Coal Co. v. Blatchford, 11 Wall. 175; Pennington v. Smith, 24 C. C. A. 155, 78 Fed. 399. The taxpayer's act expressly gives the right in a proper case to maintain an action to prevent any illegal official act. It is the theory of the act that, when it shall appear that proposed official action is illegal, the courts may prevent the taking of such action, although, being illegal, it would, if taken, confer no rights upon any one. In order, however, to entitle the complainant bringing suit under the provisions of that act to a preliminary injunction, the right to such relief must be made clear and certain.

The following excerpt from an opinion of the state supreme court, rendered in a case where consent to the operation of a street railroad was sought for, well expresses the principle which should govern upon applications of this sort. The decision was at special term, but the opinion, written by an able, careful, and experienced judge, has apparently never been questioned:

"An injunction pendente lite should only be granted in a case like the present, where the plaintiff clearly shows the official action complained of was illegal. Great injury would here result to the defendant corporation from the granting of such an injunction, while no irreparable injury would result to the plaintiff or the taxpayers generally for its refusal. The injunction sought pendente lite is precisely the same as the injunction prayed for in the complaint herein. The plaintiff thus asks us on motion to give him the equivalent of the final judgment upon a trial of the action. It is plain that, if his charges of illegality are sustained, the taxpayers will lose nothing by the proposed sale. If, on the other hand, they are not sustained, the defendant corporation will lose all it has thus far attained by the proceeding in question, and will be compelled to proceed de novo. These considerations are conclusive against the present application; for it is entirely clear that such a case of illegal official action as would justify the sweeping injunction asked has not been made out." Abraham v. Meyers (Sup.) 23 N. Y. Supp. 226, 228.

Such is the state practice, and in this circuit the federal courts do not grant injunctions pendente lite, which may change the defendant's position to his hurt without securing to the plaintiff any right not already abundantly protected, except where the right to such relief is clear.

In the case at bar, if the contemplated action of the board of aldermen, as local authorities, giving consent to the construction and operation of a road, be an exercise of power which they now possess, and which is in no way prohibited, the granting of an injunction pendente lite would not only postpone the exercise of that power, but would absolutely prevent any such exercise, since it is conceded that, after midnight on the 31st of December, whatever present powers in that regard may be possessed by the board of aldermen will cease and determine. Irreparable injury would thus be worked to the defendant railroad company. If, on the other hand, injunction pendente lite were refused, and the board of aldermen should thereupon grant the consent, and it should eventually be held by the court of last resort that such an act on their part was an illegal one (which is what complainant claims it is), no rights either of the complainant, of the city of Brooklyn, or of the taxpayers therein, would be in any wise impaired or affected by the refusal of the injunction, for such illegal consent would not be worth the paper on which it was written.

The ground upon which complainant most strenuously relies is the assumed prohibition in sections 73 and 74 of the Greater New York Charter (called hereinafter the "New Charter"), which are quoted above. As will be seen, section 73 begins as follows, "After the approval of this act, no franchise or right to use the streets, avenues, parkways or highways of the city shall be granted by the municipal assembly to any person or corporation for a longer period than twenty-five years," and proceeds with detailed provisions as to renewals, and as to disposition of plant upon termination of the franchise. In the recent case of Gusthal v. Board, 48 N. Y. Supp. 652, the appellate division of the supreme court, First department, has construed this section, holding that this prohibition against granting a franchise or right to use the streets for more than 25 years is now in force. As the decision of an appellate court of the state construing a state statute, the conclusions in the Gusthal Case may be followed by this court upon such a motion as this, although the question be not as yet settled by the state court of last resort. Briefly stated, the reasoning by which this conclusion was reached is as follows: The new charter contains the following section:

"Sec. 1611. For the purpose of determining the effect of this act upon other acts and the effect of other acts upon this act, this act shall, except as in this section is otherwise provided, be deemed to have been enacted on the first day of January, in the year 1898. This act shall take effect on the first day of January, 1898: provided, however, that where by the terms of this act an election is provided or required to be held or other act done or forbidden prior to January 1, 1898, then as to such election and such acts, this act shall take effect from and after its passage, and shall be enforced immediately, anything in this chapter or act to the contrary notwithstanding."

It is apparent from this section 1611 that the legislature contemplated that the act contained some prohibitive provisions which were

to go into effect immediately on the passage of the act. The existing condition of affairs as to franchises was, from the city's standpoint, unsatisfactory. The creation of the greater city would make such franchises more valuable, and induce a "pressure upon all those various municipalities which for a short time possessed the right of granting permanent franchises, to grant such franchises to corporations, before the statute creating the Greater New York took effect." The phrase "after the approval of the act" is a peculiar one. It must be presumed that it was coupled with the provisions of this particular section, not idly, but for some intelligent purpose. In terms, the section forbids the doing of an act after the approval of the new charter (May 4, 1897). Therefore we have an instance of "an act forbidden prior to January 1, 1898"; and, by virtue of section 1611, so much of the charter as in terms forbids such act takes effect upon the passage of the statute. To the suggestion that the prohibition was by its terms one operative only upon the "municipal assembly,"—a body which would not come into existence until January 1, 1898,—it was replied that the important words of the section were those declaring the intention of the legislature that, as to the power of granting franchises for more than 25 years, this section shall be taken out of the general provision by which the act was to take effect on January 1, 1898, and that this paramount intent must control the inconsistent subordinate provision.

The next question to be decided is whether section 74 is also now in force, and whether the grant of consent to a street-railroad company by the local authorities in the city of Brooklyn, in conformity to the provisions of law existing before the passage of the new charter, will be an illegal act, unless such consent be granted in strict conformity to the provisions of section 74. It is thought that, for the purpose of determining its effect upon prior acts, this section 74 must be deemed to have been enacted on January 1, 1898, for the following reasons:

First. This section, unlike the other, does not contain any words declaratory of the paramount intention of the legislature that it shall go into effect on the approval or on the passage of the act.

Second. Section 74 is not an essential and necessary adjunct to section 73. Section 74 provides that, before any grant of a franchise to use a street shall be made, certain specified provisions of such proposed grant shall be published for a specified time "in the City Record," and in two daily newspapers; that the proposed ordinance embodying the consent shall be referred "by the municipal assembly" to the "board of estimate and apportionment," who shall make certain specified inquiries; that no grant of such consent shall be made except on terms approved by the "board of estimate and apportionment." Finally, it provides that such grant or consent shall require the concurrence of three-fourths of all the members "elected to each branch of the municipal assembly," and further provides for a veto by the mayor, and for a vote passing the ordinance over such veto.

It will be observed that this is a regulation of the method in which consents may be granted. It is one thing to prohibit the granting of any consent whatever for a period of more than 25 years, and it is a

different thing to provide in what manner consents for a period, however short, shall be obtained.

Third. The language used in section 74 manifestly contemplates a state of affairs to come into existence only when the new charter takes effect. The detailed provisions above referred to show this plainly. The "municipal assembly," composed of two branches, each meeting and voting independently of the other, is a new creation. The publication of the "City Record" is provided for elsewhere in the new charter, and so is the creation of a "board of estimate and apportionment," with functions extending throughout the territorial limits of the new city. In construing section 73, the single secondary phrase "municipal assembly" might fairly be subordinated to the paramount intention expressed elsewhere in the section. In section 74, however, we have a succession of propositions which can hardly be called secondary, and no paramount intention inconsistent with those expressed in the section.

Fourth. If section 74 be construed as complainant contends it should be, the result will be to hold that the Greater New York charter absolutely suspends the grant of any street-surface railroad franchise within the territory constituting Greater New York, by some at least, if not by all, of the local authorities within said territory, between May 4, 1897, and January 1, 1898. Within that territory there now exists no "municipal assembly" composed of two branches. There is a board of estimate and apportionment in the city of New York, and another such board in the city of Brooklyn. Whether or not there be one in Long Island City this court is not advised, but certainly among the other political communities occupying the territory within the limits of the new city, and not within those of the existing cities, no such board is to be found. There is a publication known as the "City Record" in the city of New York. There is no such paper published in the other communities. If, therefore, the provisions of section 74 must be followed literally, or even substantially, in granting consents during the period between the passage of the act, on the 1st of January, no such consents can be granted at all, at least within a considerable portion of the territory to be occupied by the new city.

Fifth. The new charter was prepared by a board of eminent gentlemen of large experience in municipal legislation, and such charter was passed by the legislature as it came from the hands of the commission with no material change. The primary function of the commission was to prepare a body of statute law under which the new city, consolidated from the several political communities already existing, was to have its life. Any regulation, modification, or repeal of the laws in force in such original communities, before they should become welded into the new city, is legislation, germane, indeed, to the subject with which the commission was dealing, but not essentially embraced therein. It must be assumed that this eminent body of experienced men appreciated the difference between permanent legislation for the new city and temporary legislation for the original communities out of which the city was to be formed; and it might fairly be supposed that if the gentlemen who drafted this act and the

legislature who passed it intended to prohibit absolutely and peremptorily the granting of franchises in the whole or in a part of such territory intermediate the passage of the act and January 1, 1898, they would have expressed that intention with no uncertain sound. There is nothing startling or unreasonable in the proposition that section 73 is to go into effect at once, and section 74 only when the new city comes into existence. Having prohibited the local authorities in the original communities from granting franchises for more than 25 years, the legislature might, without any inconsistency, leave them in all other respects free to exercise the powers which they already possessed during the remaining eight months of their existence. It is quite conceivable that within the territorial limits of the new city there may be many local communities now existing which have absolutely nothing in common with their future'fellow citizens, and which will have nothing in common with them for years to come, except the bond of political union into a new municipality. It would not be surprising to find the legislature leaving to such communities, within the 25-year limit, the power during the brief period which must elapse before consolidation to determine for themselves what may be the immediate needs of their particular locality in the matter of street-surface railroads, instead of relegating the whole matter to the decision of new boards, in which the delegates from such local communities might be hopelessly outvoted by other delegates, who may not have so intelligent an appreciation of the needs of the locality.

Sixth. It is contended that, inasmuch as section 74 forbids the doing of certain acts therein specified, the language of section 1611 makes it operative immediately upon the passage of the new charter. Section 74 contains an express prohibition in the phrase, "No grant by the municipal assembly shall be made except on terms approved by vote or resolution of the board of estimate and apportionment." It also contains an implied prohibition, for the use of the phrase, "Before any grant shall be made, * * * [such grant] shall be published," etc., necessarily imports a prohibition against making grants without publication. The difficulty, however, with the argument from section 1611, is that it does not provide that the new charter shall take effect from its passage "where, by the terms of this act, an act is forbidden," but only "where, by the terms of this act, an act is forbidden prior to January 1, 1898"; i. e. is forbidden during the period subsequent to passage, and prior to January 1st. But section 74 does not, "by its terms," forbid any act during said period.

In conclusion, therefore, while the decision of the appellate division in the Gusthal Case, holding that section 73 is now in force, is well within the limits of judicial construction as expounded by the courts of last resort (People v. Commissioners of Taxes, 95 N. Y. 558; People v. Lacombe, 99 N. Y. 43, 1 N. E. 599; Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511), and will be followed here, it is thought that the further proposition contended for is close upon the extreme border line, and by no means so clear as to warrant the granting of an injunction pendente lite, in view of the possible results indicated at the outset of this opinion. In the absence of any

state authority supporting such proposition, this court must decide the question here presented in accordance with its own opinion, uninfluenced by the well-recognized doctrine that state court construction of state statutes will ordinarily be followed. In view of the fact that this same question is now before the appellate division, it would apparently be best to await its decision; but the time left before the end of the year is so short that it would be unjust to the defendant company to curtail such time by any order of this court, upon any doubtful construction of the law.

The remaining points which have been argued may be briefly disposed of.

Section 92 of the railroad law provides that, before acting upon an application for consent, the local authorities shall give public notice thereof, and of the time and place when it will be first considered. It further provides that, whenever the consent of the common council of the city is applied for, the "first consideration" of which notice is required may be by a committee of such common council. The common council in the city of Brooklyn took office in January, 1896, for a period of two years. Public notice, in a proper form, by advertisement, was duly given of a first consideration before the railroad committee of that board, early in 1896, and hearings thereon were had before such committee. The common council, remaining unchanged in the meantime, has selected from its members a new president for the year 1897. It has substituted a new member on the railroad committee in the place of one who died, and, in reorganizing such committee for the year 1897, has made one further change in its membership. The notice of the time and place when the application for consent is to be first considered seems to have been in strict conformity to the provisions of the section. The common council which directed the giving of such public notice is the same common council that is now about to pass upon the application. In the absence of any authority sustaining such proposition, it is very far from clear that a change in the membership of the railroad committee will operate to make the action of the common council illegal.

It is further contended that the grant in question is illegal and void, for the reason that "it includes portions of streets and avenues not included in the defendant railroad company's certificate of incorporation." This quotation from the brief asserts the existence of a fact which is disputed in the answer and affidavits. In the absence of the original certificate of incorporation or a certified copy thereof, this court is not prepared to decide such disputed question of fact in favor of complainant upon ex parte affidavits.

It is further contended that the defendant railroad company was without capacity to apply for or accept the grant of a franchise to build and operate its road. Complainant relies on section 59 of the railroad law, which provides that no corporation hereafter formed under the laws of this state shall exercise the powers conferred by law upon such corporation until the directors shall cause a copy of the articles of association to be published in one or more newspapers, nor until the board of railroad commissioners shall certify that such publication has been made, and that public convenience and necessity

83 F.—55

require the construction of such railroad. Concededly, the defendant corporation holds no such certificate. The question is not a new one. It was considered in the case of a steam railroad in People v. Board of Railroad Com'rs, 4 App. Div. 259, 38 N. Y. Supp. 528, 861; and compliance with the provisions of the section above referred to was held to be a condition precedent, even to the existence of a railroad corporation. The converse was held in the case of a street railroad by the supreme court in Erie county in McWilliams v. Jewett, 36 N. Y. Supp. 620. The opinion in Re Empire City Traction Co., 4 App. Div. 103, 38 N. Y. Supp. 983, looks in the same direction, although it is not precisely in point, since the conclusion arrived at is based upon another section of the railroad law, not presented in the case at bar. Suffice to say that, in face of the conflict of authority in the state courts above indicated, it is by no means entirely clear that the action of the common council would be illegal, upon the theory that the defendant railroad company was without capacity to apply for or accept the grant.

The application for an injunction pendente lite is granted as prayed for, so far as the provisions of section 73, prohibiting the grant of a franchise for more than 25 years, are concerned. In all other respects the motion is denied, and the preliminary stay vacated.